**BEFORE THE UNITED STATES JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION**

IN RE: DEPO-PROVERA (DEPOT
MEDROXYPROGESTERONE ACETATE)
PRODUCTS LIABILITY LITIGATION

MDL No. _____

**MEMORANDUM IN SUPPORT OF MOTION FOR TRANSFER OF ACTIONS TO
THE NORTHERN DISTRICT OF CALIFORNIA PURSUANT TO 28 USC § 1407 FOR
COORDINATED OR CONSOLIDATED PRETRIAL PROCEEDINGS**

Pursuant to 28 U.S.C. § 1407 and Judicial Panel on Multi-District Litigation ("JPML")
Rule 6.2, Plaintiffs Kristina Schmidt, Ajanna Lawson, Monique Jones, Huyen Nguyen, Taylor
Devorak, Stacey Williams and Carey J. Williams, Tanya Edgerton, Latriece Love Goodlett and
David Foster Goodlett, and Debra Morrow (hereinafter, "Plaintiffs") respectfully move this
Judicial Panel on Multi-District Litigation ("Panel") for an Order creating an MDL involving the
use of the contraceptive injection Depo-Provera and the injury of meningioma, a brain tumor, and
transferring the currently filed cases marked in the attached Schedule of Actions (collectively the
"Actions"), as well as any cases subsequently filed involving similar facts or claims ("tag-along
cases"), to the Northern District of California.

This litigation should be centralized in California as it is home to the majority of
anticipated Plaintiffs thus enabling bellwether trials. While Defendant Pfizer Inc. (hereinafter
"Pfizer") and its authorized generic affiliates still sell Depo-Provera, depot medroxyprogesterone
acetate has also been made by generic manufacturers for more than twenty years, selling typically
at a lower price. Only Massachusetts and California (which is by far the most populous state) have

1

innovator liability, allowing a plaintiff to proceed with failure to warn claims against the holder of the New Drug Application, Pfizer, even if they only took the generic version, since claims against the generic manufacturers are preempted by Supreme Court precedent as discussed *infra*. Since the huge majority of plaintiffs will be from California (since users of exclusively generic variants made by unaffiliated generic manufacturers in other states will simply not have viable claims), having the litigation in California will increase the likelihood that the MDL Court can actually preside over bellwether cases and obviate the need for *Lexecon* waivers, which are often difficult to attain.

The Northern District is replete with very seasoned MDL Judges, however, some are presently occupied with active MDLs. Seasoned MDL Judges include Judge Vincent Chhabria, Judge William Orrick, Judge Jon S. Tigar, Judge Jacqueline Corley, Judge Yvonne Gonzalez Rogers, among others. Given that Judge Chhabria is still actively handling the *Roundup Prods. Liab. Litig*., C.A. 3:16-md-0274-VC, where cases continue to be filed, Judge Corley is actively handing the relatively new baby food litigation (*In re Baby Food Prods. Liab. Litig*., C.A. 3:24-md-03101-JSC) and Judge Rogers is very occupied in the Social Media litigation (*In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig*., C.A. 4:22-md-03047-YGR), Movants recommend centralization before the Hon. William H. Orrick III or Judge Jon S. Tigar in the Northern District of California.[1] Importantly, each of the aforementioned Judges sits in the State

---

[1] The first filed case, *Schmidt v. Pfizer Inc., et al*., C.A. 3:24-cv-06875-VC, was assigned by the Clerk's office to the Honorable Vincent Chhabria, and then the related cases were similarly assigned. While Judge Chhabria is an excellent jurist with complex MDL experience, he is still very occupied with the *In Re: Roundup* MDL (3:16-md-02741-VC) where there are many "waves" of cases that did not settle and the Court manages cases by holding case specific summary judgment and *Daubert* briefings and hearings, if necessary, prior to remand to the Transferor courts. *See* https://www.cand.uscourts.gov/wp-content/uploads/2023/08/2023.08.31_Roundup-Wave-6-8-Schedule.pdf. Because the development of lymphoma, the disease at issue in the Roundup MDL, is a latent injury, new cases continue to be filed with approximately 250 new cases filed in 2024 with 4,355 pending cases listed on the JPML website as of Nov. 1, 2024.
https://www.jpml.uscourts.gov/sites/jpml/files/Pending_MDL_Dockets_By_District-November-1-2024.pdf. Thus, that MDL appears to be very active and time consuming.

of California, which is not only the most heavily populated state but is only one of two viable forums in the entire country for the many women who had generic-only usage and hope to bring products liability claims for their associated injuries of meningioma, a brain tumor.

Judge Orrick is an eminently qualified jurist with extensive experience managing MDLs. Notably, he oversaw the highly complex *In re JUUL Labs, Inc. Mtg, Sales Practices & Prods. Liab. Litig.*, C.A. 3:19-md-2913-WHO-MD, which involved consumer class, personal injury, government entity, and tribal claims, all proceeding alongside a parallel California state court coordination (JCCP). Under the auspices of Judge Orrick's careful and active case management, including two trial settings, four separate global settlements with JUUL and its Directors for 3,500 personal injury cases, close to 1,500 government entity cases, and 32 tribe cases were reached in December of 2022.[2] The following year, settlements were also reached with the co-defendant Altria. Despite the extreme complexities and diverse plaintiff and defense groups, this highly complicated litigation resulted in global resolutions for each case type in under four years, thanks in large part to Judge Orrick's superb oversight and case management. The *In re JUUL* MDL litigation has effectively wound down, with settlements distributed. There are only eleven opt-out cases which will ultimately get remanded after expert discovery and proceedings. Given Judge Orrick's ability to successfully conclude a litigation involving thousands of individual plaintiffs and government entities which proceeded seamlessly, much of it during COVID, he is well equipped to handle the new and what Movants predict to be a large litigation involving thousands of women who used Depo-Provera/medroxyprogesterone acetate and developed meningioma tumors. Judge Tigar also has significant MDL experience having concluded MDL No. 1917, *In Re: Cathode Ray Tube (CRT) Antitrust Litig.* and he does not have a present MDL.

---

[2] This tally was reported in the recent Joint Case Management Conference Statement describing the wane of the MDL Case 3:19-md-02913-WHO (Doc. 4279, 8/7/24).

Transfer of these cases at issue is well within the scope of 28 U.S.C. § 1407 as: (i) Each of the Actions involves common questions of fact, (ii) consolidation would serve the convenience of the parties and witnesses, and (iii) consolidation would promote the just and efficient conduct of the litigation.

## I.    BACKGROUND

This motion for transfer involves twenty-two (22) pending cases in eight (8) district courts asserting similar claims, with six (6) of the twenty-two (22) Actions pending in the Northern District of California and eighteen (18) of the twenty-two (22) Actions filed in one of the four California district courts. Ten (10) different law firms have filed cases. The pending cases allege plaintiffs were prescribed and administered quarterly injections of Depo-Provera, a high-dose progestin, commonly referred to as "the shot" for contraception and developed meningioma, a brain tumor. Most of the plaintiffs who have filed suit underwent intracranial surgery, with many women being left with seizure disorders, vision loss, and other permanent neurological injuries. The Depo-Provera administered to Plaintiffs was manufactured and sold primarily by a common defendant, Pfizer Inc. (hereinafter referred to as "Pfizer"), and/or its affiliated "authorized generic" co-defendants, as well as other generic manufacturers.

Recent epidemiological studies have shown an extremely strong association between the usage of Depo-Provera and the development of meningioma. Specifically, a large French case control study was published in the *British Medical Journal* in March 2024 which reported a 555% increase in the incidence of meningioma among users of Depo-Provera.[3] This was followed more recently by a study out of the University of Alabama which also found a statistically significant

---

[3] *See* Roland, et al., "Use of progestogens and the risk of intracranial meningioma: national case-control study," *BMJ*, Vol. 384, published online Mar. 27, 2024 at https://doi.org/10.1136/bmj-2023-078078 (last accessed Nov. 26, 2024).

increased incidence of meningioma associated with Depo-Provera.[4] These studies follow many years of literature reflecting that high-dose progestins are heavily involved in the growth of meningiomas.

It is notable that the recipients of Depo-Provera are predominantly minority women. "Higher percentages of Hispanic (27.2%) and Black (41.2%) women had ever used Depo-Provera, the 3-month injectable, compared with White (20.3%) and Asian (7.1%) women."[5]

### A. Defendants

Pfizer is the primary Defendant, as Pfizer has held the New Drug Application (NDA) for Depo-Provera since purchasing Defendant Pharmacia & Upjohn Co. LLC (hereinafter, "Pharmacia & Upjohn) in 2002. In 2002 the patent for Depo-Provera expired. From approximately October 2004 to November 2020, Defendant Greenstone LLC (hereinafter, "Greenstone") was Pfizer's "authorized generic" subsidiary and alter ego responsible for selling authorized generic Depo-Provera that was manufactured by Pfizer.[6] In November 2020, Greenstone was spun off to form Defendant Viatris Inc. (hereinafter, "Viatris"), which is majority owned by Pfizer. At that time, Defendant Pharmacia LLC (hereinafter, "Pharmacia") was retained by Pfizer while the Upjohn arm of Pharmacia & Upjohn was split off to join Viatris. Additionally, as part of the merger to create Viatris, Pfizer divested licensure of authorized generic Depo-Provera to Defendant Prasco,

---

[4] *See* Griffin, "The association between medroxyprogesterone acetate exposure and meningioma," *Cancers*, Vol. 16, No. 3362 (2024).

[5] Daniels, K et al., "Contraceptive Methods Women Have Ever Used: United States, 2015-2019", *Nat'l Health Statistics Report*, No. 195, Dec. 14, 2023 at https://www.cdc.gov/nchs/data/nhsr/nhsr195.pdf .

[6] Per the FDA: "[T]he term 'authorized generic' drug is most commonly used to describe an approved brand name drug that is marketed without the brand name on its label. Other than the fact that it does not have the brand name on its label, it is the exact same drug product as the branded product. An authorized generic may be marketed by the brand name drug company, or another company with the brand company's permission. In some cases, even though it is the same as the brand name product, a company may choose to sell the authorized generic at a lower cost than the brand name drug." https://www.fda.gov/drugs/abbreviated-new-drug-application-anda/fda-list-authorized-generic-drugs.

LLC d/b/a Prasco Labs. (hereinafter, "Prasco"), and Prasco has served as Pfizer's seller of authorized generic Depo-Provera since then.

There are also numerous regular (as opposed to authorized) generic versions of Depo-Provera that are manufactured by generic drug companies unaffiliated with Pfizer and who are immunized from liability due to the preemption holdings of the Supreme Court in *Pliva, Inc. v. Mensing*, 564 U.S. 604 (2011) and *Mutual Pharmaceutical Co. v. Bartlett*, 570 U.S. 472 (2013).

**B. Depo-Provera**

Depo-Provera, chemical name depot medroxyprogesterone acetate, is a high dose (150 mg) progestin injection that was approved for contraception by the FDA in 1992 following many failed attempts by Pharmacia & Upjohn to gain FDA approval over a period of nearly 30 years. Approximately 25% of all women in the United States between the ages of 18 and 44 were administered Depo-Provera between 2011 and 2015.[7]

**C. Meningioma**

A meningioma is a tumor of the meninges, the tissue layers lining the brain and spine. While most meningiomas are benign, a significant minority (10-15%) do become malignant. Further, even for meningiomas that remain "benign," this is a nominal, medical term simply connoting that there is no metastasis to other organs. Any tumor growing in the brain, even though benign, can press upon the highly sensitive brain structures and have grave consequences for the individual, including severe headaches, seizures, dizziness, vision loss, other neurological problems, and even death.

**D. Innovator Liability in California and Massachusetts**

---

[7] https://www.cdc.gov/nchs/nsfg/key_statistics/i.htm.

California and Massachusetts are the only two states in the country whose highest courts recognize innovator liability, which allows a Plaintiff to hold the brand-name manufacturer liable for failure to warn claims even if the Plaintiff only took a generic version of the drug.[8] The theory underpinning this doctrine is that, since the brand-name manufacturer—in this case Pfizer—knew that generic manufacturers were selling Depo-Provera with a label that had to exactly mimic Pfizer's label under federal law, Pfizer had a duty to make sure that label adequately warned about all known or knowable risks of the drug so that generic users of the drug would also receive those warnings. Since Pfizer failed, the generics necessarily failed, and therefore Pfizer can be held liable under California and Massachusetts law, meaning there will be many more plaintiffs from those two states with viable claims in the proposed MDL.

Therefore, it follows that California is the ideal transferee forum because California has the highest population in the country with nearly 12% of all Americans living there, and that population itself is comprised of nearly 45% people of color, on whom the drug was primarily studied and marketed.[9] With a large generic market for more than for two decades, many women in California will have received generic-only injections and therefore their cases will only be viable in California. The 48 other states have no high court-authorized innovator liability and under *Mensing* and *Bartlett, supra,* those women who only received generic depot medroxyprogesterone acetate will be left without a remedy. Accordingly, there will be far fewer plaintiffs in the MDL from states other than California and Massachusetts. Thus, California is the logical choice for an MDL, or in the alternative, Massachusetts.

### A.  Pfizer Has Enormous Facilities and Activity in California and Massachusetts

---

[8] *See T.H. v. Novartis Pharms. Corp.*, 4 Cal. 5th 145, 226 Cal. Rptr. 3d 336, 407 P. 3d 18, 29 (2017); *see also Rafferty v. Merck & Co.*, 92 N.E.3d 1205 (Mass. March 16, 2018).
[9] *See* https://data.census.gov.

Defendants, and Pfizer in particular, have fostered strong connections to the States of California and Massachusetts. Pfizer maintains the La Jolla Campus near San Diego, a 25-acre site containing more than 500,000 square feet of state-of-the-art research facilities that house more than 900 Pfizer employees studying, among other things, pharmacokinetics and cancer.[10] Moreover, the global headquarters for Pfizer's Center for Therapeutic Innovation (CTI), has established locations in both San Diego and San Francisco.[11] Similarly, in Massachusetts, Pfizer maintains two facilities in Andover and Cambridge, where more than 1,000 Pfizer scientists study pharmacokinetics and rare diseases, among other things. These facilities have for years partnered with MIT and UC San Diego, among other leading research academic institutions, to form the company's Centers for Therapeutic Innovation (CTI), a "network of collaborative partnerships with top-tier life science research institutions in California, Massachusetts and New York that aims to accelerate and transform drug discovery and development."[12] The University of California, San Francisco was "the first collaboration in the network."[13]

Accordingly, the Northern District in California, or alternatively, the District of Massachusetts, are very appropriate venues.


## II.     ARGUMENT

Transfer to the Northern District of California for consolidation and coordination of pretrial proceedings is appropriate and necessary as the Actions involve common questions of fact, the

---

[10] *See* https://www.pfizer.com/la-jolla-california.
[11] *See* https://www.pfizer.com/science/centers.
[12] https://www.pfizer.com/la-jolla-california.
[13] https://www.pfizer.com/news/press-release/press-release-detail/pfizer_launches_global_centers_for_therapeutic_innovation_a_network_of_research_partnerships_with_university_of_california_san_francisco (Nov. 16, 2010) (Last accessed Oct. 13, 2024).

centralization of these Actions will serve the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation. 28 U.S.C. § 1407.

Transfer is not premature as there are a significant number of Depo-Provera cases involving the development of meningioma already pending in multiple federal district courts; at least twenty-two (22) cases on file in at least eight (8) different federal district courts in five different states. It is anticipated that many more will be filed given the large amount of women that have been administered Depo-Provera for contraception over the years and the newly publicized discovery of the enormous odds ratio of Depo-Provera causing and or significantly contributing to the development and growth of the meningioma brain tumor. Given the geographic variety of these cases, the lack of any discovery in any filed case (with each of the cases being so newly filed that Defendants have not yet filed an Answer or Motion), the fact that none of the courts who were randomly assigned the cases have scheduled conferences for this calendar year (dates for Zoom conferences have been set for mid-January), and the anticipated number of future filings, these cases are ripe for consolidation before one transferee judge. Indeed the undersigned agreed to a more than sixty-day extension for Defendants to respond to the first federal filed complaint involving Depo-Provera and meningioma *(Schmidt v. Pfizer Inc., et al.*, C.A. 3:24-cv-06875-VC) following a discussion with Pfizer's counsel where defense counsel agreed an MDL would be appropriate and there was little point in engaging in substantive motion practice in numerous cases while an MDL was imminent. Thus, transfer pursuant to 28 U.S.C. § 1407 will lead to a just and expeditious resolution of these Actions to the benefit of all parties.

    **A.**    **The Depo-Provera Cases Involve Common Questions of Fact**

The cases allege that the plaintiffs have received Depo-Provera injections [14] manufactured and sold by common defendants Pfizer, Viatris, Greenstone, Prasco, Pharmacia & Upjohn, and Pharmacia. Federal civil actions are eligible for transfer pursuant to 28 U.S.C. § 1407 if they involve "common questions of fact" subject to discovery. *See* 28 U.S.C. § 1407(a); *In re Kugel Mesh Hernia Patch Prods. Liab. Litig*., 493 F. Supp. 2d 1371, 1372-73 (J.P.M.L. 2007). The statute, however, does not require complete identification of common questions of fact to justify transfer. *In re Zyprexa Prods, Liab. Litig*., 314 F. Supp. 2d 1380, 1381 (J.P.M.L. 2004). Almost all personal injury cases involve individualized factual issues, such as questions of causation that are case-specific. However, the existence of such differences has not been an impediment to centralization in the past and does not negate the common factual issues. *See In re Xarelto (Rivaroxaban) Prods. Liab. Litig.,* 65 F. Supp. 3d 1402, 1404 (J.P.M.L. 2014); *In* re *Wright Medical Technology, Inc., Conserve Hip Implant Prods. Liab. Litig*., 844 F. Supp. 2d 1371, 1372 (J.P.M.L. 2012).

The Panel has regularly ordered transfer for coordinated or consolidated proceedings in instances involving the use of pharmaceuticals that were manufactured and distributed by common defendants. Prior MDLs involving pharmaceutical product liability and negligence claims include: *See In re Valsartan Prods. Liab. Litig.*, C.A. 1:19-md-02875-RBK-JS; *see also In re Elmiron (Pentosan Polysulfate Sodium) Prods. Liab. Litig.*, C.A. 2:20-md-02973-BRM-ESK; *see also In re Proton-Pump Inhibitor Prods. Liab. Litig.*, C.A. 2:17-md-02789-CCC-MF; *see also In re Fosamax (Alendronate Sodium) Prods. Liab. Litig.*, C.A. 3:08-cv-00008-FLW; *see also In re*

---

[14] Pfizer also manufactures the less utilized product Depo-SubQ Provera 104 which contains the same chemical ingredient depot medroxyprogesterone acetate at a lower dose (104 mg instead of 150 mg). It is injected subcutaneously instead of intramuscularly but at the same frequency, every three months. While that product is less dangerous given its lower dose, cases involving this variant should also be included in the MDL, especially since some women received the two formulations over different periods of time.

*Actos® (Pioglitazone) Prods. Liab. Litig.*, C.A. 6:11-MD-02299-RFD-PJH; *see also In re Zantac (Ranitidine) Prods. Liab. Litig.*, C.A. 9:20-md-02924-RLR-BER; *see also In re Taxotere (Docetaxel) Prods. Liab. Litig.*, C.A. 2:16-md-02740-KDE-MBN; *see also In re Glucagon-Like Peptide-1 Receptor Agonists (GLP-1 RAS) Prods. Liab. Litig.*, C.A. 2:24-md-03094-KSM.

Similarly, the cases presented here share a common core of operative facts. All Plaintiffs allege that Depo-Provera is defective, is administered at an unnecessarily high dose, contains inadequate warnings, and all Plaintiffs have been diagnosed with meningiomas, most of which have either been treated with radiation and/or highly invasive craniotomy with the rest under close observation by a physician. The cases involve a shared biomechanism of action as well as the same injury, meningioma, and sequelae related thereto, including but not limited to dizziness, vision problems, neurological symptoms, severe headaches, seizures, the need for radiation and/or highly invasive brain surgery, and even death.

Among the common factual issues are the causal relationship between the high dose of Depo-Provera and the associated increased risk of development of meningioma, as well as the failure to warn of that risk in the label which continues to date despite the fact that Pfizer advises of meningioma risk in its Canadian and European labels. Each Plaintiff alleges Pfizer and the other Defendants knew or should have known of the unreasonably high dose-dependent risk of developing meningioma associated with Depo-Provera and yet failed to properly warn doctors and patients when they knew of the severe dangers associated with it, especially in light of Defendants' own somewhat safer, lower effective dose in the form of the existing, FDA-approved lower-dose subcutaneous variant, Depo-SubQ Provera 104. Cases that share core issues of fact concerning design, manufacture, testing, marketing, and labeling of a pharmaceutical product are appropriate for consolidation. *See In re Invokana (Canagliflozin) Prods. Liab. Litig.*, C.A. 3:16-md-02750-

BRM-LHG; *see also In re Valsartan Prods. Liab. Litig.*, C.A. 1:19-md-02875-RBK-JS; *see also In re Elmiron (Pentosan Polysulfate Sodium) Prods. Liab. Litig.*, C.A. 2:20-md-02973-BRM-ESK; *see also In re Proton-Pump Inhibitor Prods. Liab. Litig.*, C.A. 2:17-md-02789-CCC-MF; *see also In re Xarelto (Rivaroxaban) Prod. Liab. Litig.*, C.A. 2:14-md-02592-EEF-MBN; *see also In re Zantac (Ranitidine) Prods. Liab. Litig.*, C.A. 9:20-md-02924-RLR-BER; *see also In re Avandia Mktg., Sales Practices & Prods. Liab. Litig.*, C.A. 2:07-md-01871-CMR; *see also In re Tepezza Mktg, Sales Practices & Prods. Liab. Litig.*, C.A. 1:23-md-03568-TMD.

Plaintiffs have also asserted the same legal theories of liability, including negligence, failure to warn, breach of express and implied warranties, strict liability, and defective design. Plaintiffs raise common questions of fact to support their theories of liability including: the association in the scientific literature between usage of Depo-Provera and development of meningioma, how Depo-Provera as a high-dose progestin is mechanistically involved in the development of meningioma, when Defendants first should have learned of the harmful effects caused by Depo-Provera; whether, and for how long, Defendants concealed this knowledge from physicians and patients and continued to promote sales of Depo-Provera; whether Depo-Provera was defectively designed in that Defendants failed to promote the lower effective dose, Depo-SubQ Provera 104, as being safer with respect to the risk of meningioma and other dose related risks; whether Defendants failed to provide adequate warnings concerning Depo-Provera and the risk of meningioma; whether Defendants engaged in fraudulent and negligent marketing practices regarding Depo-Provera; and the nature and extent of damages suffered by Plaintiffs as a result of Depo-Provera.

Moreover, intertwined with these facts, is the timing of the corporate changes. Discovery will likely be fruitful as to what role the merger in November 2020 between Upjohn, Mylan N.V.,

and Defendant Greenstone to form Defendant Viatris had with disclosure or suppression of these significant safety problems. In November 2020, the Federal Trade Commission intervened to address the anticompetitive effects of the merger between Defendant Pfizer's Upjohn division and Mylan N.V. by requiring the newly formed Defendant Viatris to divest certain assets and grant licenses for various generic pharmaceutical products to Defendant Prasco in order to preserve competition. As part of the FTC's decision, Viatris was required to divest Upjohn's authorized generic rights and related assets for six products, including medroxyprogesterone acetate injectable solution, to Prasco.[15] Discovery as to the due diligence of the various corporate entities at the time of these transactions, as to the risks of Depo-Provera, will be important.

Accordingly, the Interested Parties respectfully request the Panel order coordinated or consolidated proceedings for cases involving the usage of Defendants' Depo-Provera and Depo-SubQ Provera 104 and the attendant development of meningioma. *We believe the injury should be expressly limited to meningioma* to avoid the risk of unrelated injuries muddling this proposed MDL for a very specific signature injury.[16]

**B.    Consolidation of these Cases Would Serve the Convenience of the Parties and Witnesses**

Pretrial coordination of these cases will serve the convenience of the parties and witnesses. When cases involve common issues of fact, consolidation will serve the convenience of the parties and witnesses by preventing the duplication of discovery as well as inconsistent or repetitive

---

[15] https://www.ftc.gov/news-events/news/press-releases/2020/10/ftc-imposes-conditions-combination-pfizer-incs-upjohn-mylan-nv
[16] It has been observed that when publicity associated with a new MDL ensues, in some situations, plaintiffs with other complaints may seek counsel, piling onto a litigation which was not intended to address unrelated problems. That then makes the litigation unnecessarily larger, takes longer to conclude, and imposes complications and higher expert costs, as well as burdening the court with *Daubert* challenges for injuries not within the intended MDL scope.

pretrial rulings. *See In re Meridia Prods. Liab. Litig.*, 217 F. Supp. 2d 1377 (J.P.M.L. 2002). It will also conserve the resources of the parties and the judiciary. *See id.* at 1378.

Plaintiffs' common theories of negligence, product defect, and failure to warn run throughout each action and will reduce duplicative discovery and motion practice relating to those common theories. Consolidation will reduce the number of discovery requests, and the costs associated with multiple productions in numerous district courts. Specifically, depositions of key witnesses can be coordinated. Additionally, Pfizer and the other defendants can produce documents to one central location as opposed to producing documents to each individual plaintiff. If transfer is denied in this litigation, these cases will proceed on independent tracks, requiring duplicative discovery, and repeated depositions of the same corporate personnel. Both Plaintiffs and Defendants would benefit from centralization, and the economies of scale that it would bring.

Furthermore, California would be the most convenient state for many parties and non-party witnesses. Depo-Provera was administered more to women in California than anywhere else in the country, as California has the highest population amongst all states at approximately 39.5 million people.[17] Accordingly, the most claims will be brought in California and those claims of California citizens will all be subject to California's governing innovator liability law holding Pfizer responsible for generic use. Therefore, it follows that a California federal court is most appropriate to oversee an MDL docket that will likely be comprised of more California plaintiffs than citizens of other states. This is especially important given that Depo-Provera's exclusivity patent expired more than 20 years ago, which means many women received generic medroxyprogesterone acetate shots.[18] Sadly for women from the 48 other states without the innovator liability remedy, their

---

[17] https://www.census.gov/quickfacts/fact/table/CA/PST045223
[18] There are more than a dozen generic (excluding authorized generic) manufacturers of depot medroxyprogesterone acetate suspension for injection. *See*

cases against the numerous pure generic (as opposed to the authorized generic companies) will not be viable, and there will be far fewer plaintiffs from states other than California or Massachusetts. Additionally, California has the highest number of Black and Latina women of any state in the country.[19] This is especially important given Plaintiffs' well-founded allegations that Defendants primarily studied Depo-Provera on low-income minority populations, and marketed and directed sales at those same populations, many of whom had no choice but to accept that often-subsidized option.[20]

Moreover, given the extensive use of Depo-Provera at Kaiser Permanente, a major hospital and provider system in the populous Bay Area, which touts the benefits of the Depo-Provera shot on its website,[21] many plaintiffs will be citizens of the Northern District. This is consistent with the fact that to date, six cases have been filed there. San Francisco is also a very convenient venue for key witnesses, including many of the Plaintiffs and Plaintiffs' prescribing gynecologists and treating neurosurgeons, neurologists, and ophthalmologists who live and practice in the area. Additionally, the Bay Area is one of the few regions in the world with three transit-friendly major airports making it easily accessible for any other e.g. corporate witnesses. Therefore, consolidation of the Depo-Provera cases will serve the convenience of the parties and witnesses, with the Northern District of California being the most convenient and efficient venue.

### C.   Transfer to The Northern District of California Promotes the Just and Efficient Conduct of the Litigation.

---

https://dailymed.nlm.nih.gov/dailymed/search.cfm?labeltype=human&query=Medroxyprogesterone+acetate&page=2&pagesize=20.
[19] https://www.census.gov/library/visualizations/interactive/race-and-ethnicity-in-the-united-state-2010-and-2020-census.html
[20] https://www.cdc.gov/nchs//data/nhsr/nhsr195.pdf
[21] *See* https://healthy.kaiserpermanente.org/health-wellness/birth-control/types/birth-control-shot.

Lastly, consolidation of these cases would promote the just and efficient conduct of the litigation. In the matters presently pending, discovery and motion practice have not yet commenced, nor have answers been filed. Thus, pretrial coordination would prevent the production of duplicative discovery in at least twenty-two (22) actions and avoid repetitive disputes over the same issues in multiple federal district courts. The Movants maintain that centralization will create for greater efficiency, alleviate the potential for inconsistent rulings, and preserve the resources of the judiciary.

As to what is an appropriate transferee forum, the Panel must balance a number of factors, including: the experience, skill and caseloads of the available judges; the number of cases pending in the jurisdiction; the convenience of the parties; the location of the witnesses and evidence; and the minimization of cost and inconvenience to the parties. *See In re Lipitor (No. II)*, 997 F. Supp. 2d at 1357; *see also In re Preferential Drugs Prods. Pricing Antitrust Litig*., 429 F. Supp. 1027, 1029 (J.P.M.L. 1977); *see also In re Tri-State Crematory Litig*., 206 F. Supp. 1376, 1378 (J.P.M.L. 2002).

Judge Orrick is an eminently qualified jurist whose *In re JUUL* MDL oversight responsibilities have wound down due to his exemplary handling of a complex MDL that resulted in very successful global settlements.[22] The Northern District has 17 other active MDLs, none of which Judge Orrick manages.

### D. Bellwether Trials and *Lexecon*

Centralizing the litigation in the Northern District of California gives the best chance that the MDL court will actually be able to oversee bellwether trials with a robust choice of bellwether plaintiffs over whom the MDL court would have jurisdiction, since the vast majority of generic-

---

[22] Juul cases have not been filed since the global settlements given that the conduct that was the origin of the litigation – marketing to youth with kid flavored vapes - stopped years ago, and the statute of limitation expired.

only cases (with use from 2002 when the medication went off-patent and onward) will be viable only in California and Massachusetts. California is where the majority of such plaintiffs will reside, and thus for those forum resident plaintiffs, there will be no need for a *Lexecon*[23] waiver, which has increasingly become an obstacle in mass torts to fielding a viable pool of bellwether candidates. This is because the MDL transferee court cannot preside over the trial of a case that would otherwise be remanded to a different district under § 1407. *See*, *e.g.*, *In re DePuy Orthopaedics, Inc.*, 870 F.3d 345, 348 (5th Cir. 2017).

Judge Eldon Fallon explained that "only cases deriving from one source—<u>those filed directly into the MDL by residents of the state in which the transferee court sits—are amenable to trial without the consent of the parties</u>. From a realistic standpoint, this typically will not suffice to warrant the cost and effort necessary to conduct fruitful bellwether trials. Thus, as a predicate for meaningful bellwether trials, the parties must be willing to waive their objections…." (emphasis supplied).[24]

There are numerous MDLs where parties were unwilling to waive *Lexecon*. It has been noted that "many significant MDL cases have been scuttled when parties refused to consent."[25] *See also In re Yasmin Yaz*, 3:09-md-02100-DRH-PMF, MDL No. 2100, Case No. 3:09-cv-10217-DRH-PMF (S.D. Ill. Dec. 5, 2014) ("The defendants have exercised their right to have the cases tried in the jurisdictions which would be the appropriate forum if they had been filed there originally or not transferred to this transferee court.").[26] Indeed, the problem of the MDL jurists not being able to try cases in the MDL has been the topic of legal scholarship for more than a

---

[23] *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 34 (1998).
[24] E. Fallon, Bellwether Trials in Multidistrict Litigation, TULANE LAW REVIEW, Vol. 82:2323, 2357 (2008).
[25] S. Scharff, Streamlining Mass Tort Litigation, Reigniting the Movement to Overturn *Lexecon*, THE FEDERAL LAWYER, 68-73 (Aug. 2015), available at https://www.fedbar.org/wp-content/uploads/2015/08/Mass-Tort-pdf-1.pdf.
[26] S*ee also In re Mentor Corp. Obtape Transobturator Sling Prods. Liab. Litig.*, 2014 U.S. Dist. LEXIS 22638, 4 (M.D. Ga. Feb. 24, 2014) ("The parties did not agree to waive their 28 U.S.C. § 1407(a) right to remand of Cline's action back to Minnesota.").

decade and even generated failed legislative efforts to address the *Lexecon* holding. "The primary obstacle to forming a representative pool of cases in mass tort litigation is that § 1407, as interpreted by the Supreme Court, does not permit an MDL court to retain cases for trial."[27]

The need to have sufficient cases for bellwether trials is a compelling reason for situating the MDL in California. Thus, given Judge Orrick's notable MDL experience, the critical mass of generic-only cases that are viable only in California and Massachusetts, the high population particularly of Hispanic and Black women in California who were the most targeted for clinical study and sale of Depo-Provera, the obviation of *Lexecon* with a critical mass of California resident Plaintiffs, and the convenience of the parties and witnesses, the Northern District of California would best promote just and efficient conduct of the Depo-Provera Litigation.

## III.   CONCLUSION

Transfer and consolidation for pre-trial proceedings of all pending and subsequently filed Depo-Provera meningioma cases will promote the just and efficient conduct of these Actions by allowing national coordination of discovery and other pretrial efforts, will prevent duplicative and potentially conflicting pre-trial rulings, will reduce the costs of litigation, and allow cases to proceed more efficiently to trial.

For all of the foregoing reasons, Plaintiffs respectfully request that the Panel issue an order transferring all actions listed in the attached Schedule of Actions, as well as all subsequently filed related actions, for coordinated and consolidated pretrial proceedings to the Northern District of California, San Francisco vicinage before Judge Orrick or Judge Tigar.

---

[27] S. Scharff, *supra*, at 70.

Dated: <u>November 26, 2024</u>                    Respectfully Submitted,

<u>/s/ Ellen Relkin</u>

Ellen Relkin (ER-9536)
Weitz & Luxenberg, P.C.
700 Broadway
New York, NY 10023
Phone: (212) 558-5715
Fax: (212) 344-5461
erelkin@weitzlux.com

Brendan A. McDonough (BM-4172)
Weitz & Luxenberg, P.C.
220 Lake Drive East, Suite 210
Cherry Hill, NJ 08002
Phone: (856) 755-1115
bmcdonough@weitzlux.com

Melinda Davis Nokes
Weitz & Luxenberg P.C.
1880 Century Park East, Suite 700
Los Angeles, CA 90067
Phone: (310) 247-0921
mnokes@weitzlux.com

*Counsel for Plaintiffs Kristina Schmidt, Ajanna Lawson, Monique Jones, Taylor Devorak, Huyen Nguyen, Stacey and Carey J. Williams, Tanya Edgerton, Latriece Love Goodlett and David Foster Goodlett, and Debra Morrow*